IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEM BELTON, | Case No.  15-13602 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |
| DRAFTKINGS, INC.,<br>a Delaware corporation | |
| and | |
| FANDUEL, INC.,<br>a Delaware corporation | |
| Defendant. | |

## INTRODUCTION

1.       Defendants DraftKings, Inc. ("DraftKings") and FanDuel, Inc. ("FanDuel") operate Daily Fantasy Sports ("DFS") websites that purport to be competitions in which consumers are rewarded based purely on a combination of knowledge, acumen, and luck.  As both Defendants are industry leaders in DFS, many consumers pay to compete on both websites for individual payouts that can rise above a million dollars.

2.       In reality, DraftKings' competition is rigged.  DraftKings knowingly allows FanDuel personnel—including executives—to routinely use inside information to compete against DraftKings' "real" consumers.[1]  FanDuel, for its part, allows and even tacitly encourages this fraud:  its employees can profit significantly more by using the inside information they gain at FanDuel through their employment to defraud DraftKings' customers than they can earn from their "official" FanDuel salaries.

---

[1] FanDuel's competition is similarly rigged and for similar reasons.  That competition is the subject of a separate, contemporaneously filed lawsuit in the Southern District of New York.

3.      On October 15, 2015, the Federal Bureau of Investigation announced a criminal investigation of Defendants arising from the misconduct alleged herein.  Relatedly, a federal grand jury has issued a subpoena to the trade group that oversees DFS as part of an investigation into the practices and legality of DFS websites.  The New York State Attorney General has also opened an inquiry into the prospect that employees of both companies won lucrative payouts based on information unavailable to the public.

4.      Plaintiff Alem Belton has been a DraftKings customer since 2011 (he is also a FanDuel customer).  He alleges that, although he paid DraftKings for a fair competition, he received an unfair one in violation of Massachusetts consumer fraud and contract law.

## ALLEGATIONS CONTAINED IN THIS COMPLAINT

5.      Allegations concerning Mr. Belton are based on personal knowledge.  All other allegations are based on investigation by Plaintiff's counsel.

## WHY PLAINTIFF HAS FILED THIS LAWSUIT

6.      Mr. Belton is a resident of New York who spent money on DraftKings to compete for money using his skill and knowledge of professional sports.  DraftKings held itself out to Mr. Belton and all members of the proposed class as offering a competition that was based on skill. Mr. Belton and other class members did not pay for a rigged competition in which employee insiders could compete against them with non-public information.

7.      Mr. Belton brings this suit not only to compel DraftKings and FanDuel to make him whole, but also to compel DraftKings and FanDuel to make every other player whole who paid for a fair game and did not get one.

## I.      PARTIES

8.      Plaintiff Alem Belton is a resident of Mount Vernon in Westchester County, New York and a citizen of New York.  Mr. Belton would not have paid to compete on DraftKings if

1277484.1

he had known that DraftKings allowed FanDuel personnel ("insiders") to rig DraftKings'

contests.

9.      Defendant DraftKings, Inc., is a Delaware corporation with its principal place of

business in Boston, Massachusetts.

10.     Defendant FanDuel, Inc., is a Delaware corporation with its principal place of

business in New York, New York.

## II.    JURISDICTION AND VENUE

11.     The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A)

because the amount in controversy exceeds $5,000,000 and DraftKings is a citizen of

Massachusetts, while at least one proposed plaintiff is a citizen of another state.

12.     Both defendants are subject to personal jurisdiction in Massachusetts.  DraftKings

is headquartered in Massachusetts, is at home in Massachusetts, conducts substantial business in

Massachusetts, and purposefully placed its services into the stream of commerce within

Massachusetts and throughout the United States.  DraftKings intentionally targeted

Massachusetts customers with its games.  Similarly, FanDuel conducts substantial business in

Massachusetts and purposefully placed its services into the stream of commerce within

Massachusetts and throughout the United States.  FanDuel intentionally targeted Massachusetts

customers with its games.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because DraftKings'

headquarters is located within the District of Massachusetts and a substantial part of the events

and omissions giving rise to the claims alleged herein occurred within this District.

III.   **FACTS COMMON TO ALL COUNTS**

   A.   **The Daily Fantasy Sports Industry.**

   14.    As explained above, DraftKings and FanDuel operate daily fantasy sports ("DFS") websites.  DFS is an unregulated industry in which consumers compete against one another in what are known as fantasy sports games.  On DFS websites, consumers draft fantasy teams composed of real athletes in a given sport.  Consumers input this information into the website before the athletes compete in actual games.  After the actual games have been played, DFS websites assign values to individual athletes based on computer algorithms and the athletes' performances.  Each DFS customer's fantasy team's performance is based on the cumulative value the DFS websites assign to the individual players on the fantasy team.  DraftKings and FanDuel run daily and weekly online contests.

   15.    DFS customers play against each other by choosing a line-up of players at certain positions.  The entry fee can range from as low as 25 cents and as high as $5,300.[2]  The players whose fantasy teams score the most points win the most money.  Customers can play against one another in head to head contests ("h2h") or against many players in larger contests.

   16.    DFS customers pay money to compete for cash prizes.  The prize pools are funded by entry fees.  DraftKings makes money by taking a percentage of a customer's entry fee, so its business model is based on attracting as many paying entrants as possible to its games.

   17.    In 2015, DraftKings and FanDuel spent more than a combined $100,000,000 on television ads and became two of the top television advertisers in the United States.  As a result of this advertising blitz, they added millions of new users.

---

[2] http://www.dailyfantasysports101.com/draftkings-nfl-5-million-opening-week/ (accessed Oct. 12, 2015).

18.     DraftKings has increasingly attracted new users by advertising guaranteed prize pools, in which an individual consumer is guaranteed to win a large amount of money.  By way of example, DraftKings promised to distribute $10 million dollars in prize money among all of the players in a particular contest.[3]  When DraftKings does not make enough money from entries to fund the guaranteed prize pools, it has to pay the difference from its own coffers.  This makes it extremely important for DraftKings to attract as many paying customers as possible.

19.     Both DraftKings and FanDuel have grown rapidly.  In 2014, DraftKings reported $304 million in entry fees and $40 million in revenue, compared to $3 million in revenue the previous year.[4]  In 2014, FanDuel reported $621.7 million in entry fees, of which FanDuel took $57.3 million in revenue from its customers—a four-fold increase over 2013.[5]

   **B.     "Game of Skill" Representations.**

20.     DraftKings represents that it offers a fair competition based on knowledge, acumen, and some degree of chance.  In one commercial in August 2015 DraftKings advertised itself as "a game within the game that requires a different set of skills…we don't just play, we are players, we train, and we win."[6]  In another television commercial that ran in August 2015, DraftKings advertised "every week, use your knowledge and showcase your skills … you like football, you like winning."[7]  In its terms and conditions, DraftKings has a specific subsection

---

[3] http://www.prnewswire.com/news-releases/draftkings-kicks-off-largest-fantasy-football-contest-ever-with-10-million-prize-pool-300124378.html (accessed Oct. 12, 2015).

[4] http://www.betaboston.com/news/2015/01/22/draftkings-releases-some-impressive-financial-numbers/ (accessed Oct. 11, 2015)

[5] http://www.bizjournals.com/newyork/blog/techflash/2015/01/fanduel-triples-revenue-draws-1-million-users-in.html (accessed Oct. 10, 2015).

[6] *See* https://www.youtube.com/watch?v=bfCm6PJuL5I (accessed Oct. 10, 2015).

[7] *See* https://www.youtube.com/watch?v=VDa-cDu8KYg (accessed Oct. 10, 2015).

1277484.1

named "Contest of Skill," in which it repeatedly brings attention to the fact that "[c]ontests offered on the website are contests of skill."[89]

### C.    **Inside Information.**

21.    Most of the money on DFS sites goes to a few individuals at the top.  Sports Business Daily reported that, in the first half of the 2015 Major League Baseball season, a mere 1.3% of competitors won 91% of the prize money.[10]  Bloomberg reported a similar distribution in football, which is also heavily weighted towards the top 1% of players.[11]  Top players can enter hundreds of contests per day.

22.    The biggest advantage any player can have is having data and information that other players don't have.  Defendants' personnel have access to multiple kinds of data and information that is not accessible to the public, which they allow their personnel, and each other's personnel, to exploit for financial gain.

23.    Most importantly, Defendants' personnel have (and at all relevant times, had) real-time access to data on current line-ups of every player in every contest and the overall ownership percentages of every player.  For example, in one instance a DraftKings employee accidentally leaked consumers' ownership percentages of players online before the relevant

---

[8] *See* https://www.draftkings.com/help/terms (accessed Oct. 10, 2015).

[9] FanDuel similarly represents that it offers a fair competition based on knowledge, acumen, and some degree of chance.  It advertised that consumers should use FanDuel to "get paid for [ ] knowledge" and to compete in "a public league for big bucks" if they are "smarter than the average fan."  http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge (accessed Oct. 10, 2015).  Indeed, FanDuel states specifically:  "FanDuel is a game of skill."  https://www.fanduel.com/terms (accessed Oct. 10, 2015).

[10] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (accessed Oct. 7, 2015).

[11] http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football (accessed Oct. 7, 2015)

1277484.1

game was played.[12]  Inside data regarding line-ups is invaluable inside information.  It is very

difficult for a competitor to win one of DraftKings' contests unless he or she selects players that

are not selected by many other competitors.[13]  Thus a player with statistical data about ownership

percentages of competitors has a significant advantage over players without this data.  And

because many of DraftKings' customers are also FanDuel customers, and because the two pools

of users have access to the same public information, FanDuel's personnel can predict with

reasonable certainty which players will be popular on DraftKings.  In other words, FanDuel

personnel can select low-owned players who have the potential to do well but are not often

selected.  This offers insiders a very significant advantage over regular consumers.

24.     Insiders (i.e., FanDuel personnel) have many other significant advantages over

honest consumers.  For example, both Defendants set player pricing through certain proprietary

models.  Data from these models provides insiders with details about the value of certain players

that other contestants do not have. FanDuel insiders can also copy information from the most

consistent winners on FanDuel to compete with that same information on DraftKings.  FanDuel

insiders also can identify weak players on FanDuel and then seek out those same players on

DraftKings for truly lopsided head-to-head matchups.

---

[12] https://rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#reply-850635
(accessed Oct. 8, 2015).

[13] If a consumer selects only players that have been selected by other consumers, he or she has
only a vanishingly small chance of winning because the consumer has the same team as many
other competitors.  *See*
http://www.slate.com/articles/sports/sports_nut/2015/03/ncaa_bracket_picks_2015_why_you_sh
ould_bet_against_kentucky_and_pick_arizona.html (explaining the principle of selecting players
or teams that other people do not select) (accessed Oct. 13, 2015).

**D.** **Insiders Made a Substantial Amount of Money at the Expense of Honest Competitors.**

25.     Using their inside information, FanDuel insiders reaped substantial profits from DraftKings users such as Mr. Belton, just like DraftKings insiders reaped substantial profits from FanDuel users.  For example, the same DraftKings employee who accidentally posted player ownership percentages online was an active player at FanDuel.  The same weekend he accidentally leaked information online he won $350,000 on FanDuel, beating 229,883 entrants to win second place in a large competition.  This employee had previously worked for rotogrinders.com, a website devoted to covering DFS.  After he began to work for DraftKings, his winnings on FanDuel increased dramatically.[14]

26.     According to Legal Sports Report, "the amount of cross-site play by operator employees is substantial."[15]  An insider who wished to remain anonymous told Legal Sports Report that "a significant number of the whales (high-volume players) at the top DFS sites are employees—often executives—of other sites."[16]  FanDuel's CEO admitted to personally playing on competitors' sites.[17]

27.     Employees at DraftKings and FanDuel are highly successful on each other's sites. For example, the New York Times reported that Andre Bessette, an analytics manager at

---

[14] http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (accessed Oct. 13, 2015).

[15] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/ (accessed Oct. 12, 2015).

[16] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/  (accessed Oct. 7, 2015).

[17] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=3 (accessed Oct. 7, 2015).

DraftKings recently won a $50,000 first prize on FanDuel.[18]  FanDuel employee Matthew

Boccio, conversely, won DraftKings' King of Boston contest for $50,000 in June 2015.[19]

28.     FanDuel profiled one of its own employees who played on other sites and had

won $50,000 in a short period of time, but has since removed the article from its website.[20]  An

analysis by DFS Report shows that this employee, who works in product operations is one of the

top 50 players in all of DFS.[21]  This individual won more than $50,000 in the early part of the

baseball season.  One of his jobs includes setting player prices, which gives him detailed daily

information about pricing models and could help him identify inefficiencies or opportunities on

other sites.

29.     In another example profiled by the New York Times, one FanDuel customer, who

like many FanDuel customers played on both FanDuel and DraftKings, reported that a user

named "Rick Sawyer" challenged the customer on FanDuel.  Rick Sawyer is also the name of a

business planning manager at DraftKings.[22]  That customer stated that the business planning

manager had used his access at DraftKings to determine that the customer was a weak player,

and therefore proposed to play against him.

30.     Another customer reported that he had previously brought the name of "Rick

Sawyer" to the attention of DraftKings CEO Jason Robbins.  According to user Shark61350's

---

[18] http://www.nytimes.com/2015/10/12/sports/fantasy-sports-draftkings-fanduel-insiders-edge-football.html (accessed Oct. 12, 2015)

[19] Mr. Boccio sets player prices for FanDuel, and is reportedly among the highest-ranked of all fantasy players according to Rotogrinders.  http://www.nytimes.com/2015/10/12/sports/fantasy-sports-draftkings-fanduel-insiders-edge-football.html (accessed Oct. 12, 2015).

[20] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (accessed Oct. 7, 2015).

[21] https://dfsreport.com/6898/follow-up-to-draftkings-fanduel-mishaps/ (accessed Oct. 7, 2015).

[22] http://www.nytimes.com/2015/10/12/sports/fantasy-sports-draftkings-fanduel-insiders-edge-football.html (accessed Oct. 12, 2015).

post on RotoGrinders after the New York Times published its story, Shark61350 wrote CEO Robbins and informed him that Rick Sawyer challenged him some ten times over a period of a month for head-to-head duels of $5 to $10 dollar values during his first season on FanDuel. The user questioned CEO Robbins as to whether he was "specifically targeted by DK employees" as an easy money target on FanDuel. The user also noted that his screen names are completely separate and was curious how the connection was made between separate screen names on separate sites.[23]

31.    In another example of the use of inside information reported by the New York Times, a customer met an executive of DraftKings, Jon Aguiar, at a party and discussed with Mr. Aguiar his baseball contest choices. Mr. Aguiar then took out his phone, quickly browsed it, and told the customer that the pitcher the customer had selected was a very bad choice because he was a high-owned player.[24]

32.    FanDuel's employees' use of DraftKings website was widespread. And vice versa. According to an investigation by ESPN, for example, DraftKings employees have won at least $6,000,000 playing at FanDuel.[25]

### E.    FanDuel and DraftKings Management No Less Than Tacitly Encouraged its Personnel to Play on Each Other's Sites.

33.    DraftKings and FanDuel had no policy against their personnel playing on other DFS sites and knew their employees were doing so. Both sites actively recruited dedicated DFS enthusiasts to work for the company and allowed them to play competitors' games.

---

[23] https://rotogrinders.com/threads/new-york-times-article-on-dk-employee-rick-sawyer-targeting-players-on-fd-885914 (accessed Oct. 12, 2015).

[24] http://www.nytimes.com/2015/10/12/sports/fantasy-sports-draftkings-fanduel-insiders-edge-football.html (accessed Oct. 12, 2015).

[25] http://www.businessinsider.com/draftkings-daily-fantasy-sports-fanduel-2015-10 (accessed Oct. 13, 2015).

1277484.1

34.     DraftKings' founder Paul Liberman is reported to have stated at a conference at Babson College that barring employees from playing games would make it difficult to retain talented employees because these employees made so much more money playing DFS than working for the companies: "We have some people who make significantly more money off of our competitors' sites than they do working for DraftKings."[26]  Both companies' policy therefore functioned as an artificial wage, allowing the companies to retain employees at low wages by permitting them to use other DFS websites while privy to inside information that gave them an unfair competitive advantage.

35.     DraftKings and FanDuel are sophisticated websites that had the analytics of relevant inside information to help employees succeed.  For example, DraftKings CEO Robbins admitted to having such information.  When a consumer asked DraftKings CEO Robbins for certain statistics, DraftKings CEO Robbins replied "[w]e can set up the rules however we want" and told the user "I prefer not to share the real numbers publicly."[27]  The reason CEO Robbins stated was that "I really don't think site owners should be sharing stats on winning vs. non-winning strategies.  Part of what makes this a skill game is that people who are skilled can figure out for themselves how to win consistently."[28]

36.     DraftKings and FanDuel only changed the above policies after the public learned that insiders were winning large amounts of money on DFS sites.[29]

---

[26] http://www.nytimes.com/2015/10/12/sports/fantasy-sports-draftkings-fanduel-insiders-edge-football.html (accessed Oct. 12, 2015).

[27] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=5 (accessed, Oct. 12, 2015).

[28] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=5 (accessed Oct. 12, 2015).

[29] Their initial policies were identical, their subsequent policies were virtually identical, and they changed their policies on the same day.

37.     FanDuel issued a statement to its users on October 7, 2015 in which it claimed:

"We have permanently banned our employees from playing any daily fantasy games for money, on any site.  We will also require all customers to confirm that they are not an employee of any other third party fantasy site, and if they are, they will not be allowed to access our site."[30] Similarly, on October 7, 2015, DraftKings stated that its "employees will permanently be prohibited from participation in any public daily fantasy games for money."[31]

## IV.     CLASS ALLEGATIONS

### A.     Proposed Class Definition.

38.     Plaintiffs propose a class consisting of:

> All United States residents who deposited money into a DraftKings account
> before Oct. 6, 2015 and competed in any contest where other entries were made
> by employees from FanDuel, DraftKings, or any other DFS site.

Excluded from this definition are:
- Any executive, officer, employee, consultant, or agent of a DFS business;
- Defendants and any entities in which Defendants have a controlling interest, or which have a controlling interest in either of Defendants;
- Any entities in which Defendants' officers, directors, or employees are employed;
- Any of the legal representatives, heirs, successors, or assigns of Defendants;
- The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;
- Any of Defendants' outside counsel and their immediate family.

### B.     The Class is so Numerous that Individual Joinder is Impractical.

39.     DraftKings generated approximately $40 million in revenue in 2014, and reported $304 million in entry fees.[32]

40.     On information and belief, there are at least tens of thousands of class members.

---

[30] https://newsroom.fanduel.com/2015/10/07/statement-to-the-press (accessed Oct. 12, 2015).

[31] http://playbook.draftkings.com/press/draftkings-statement-1072015/ (accessed Oct. 12, 2015).

[32] http://www.betaboston.com/news/2015/01/22/draftkings-releases-some-impressive-financial-numbers/ (accessed Oct. 11, 2015)

1277484.1

C.     **The Answers to Questions Common to the Proposed Class will Drive the Resolution of this Litigation, and Common Questions Predominate over Individual Questions.**

41.     The answer to common questions will determine Defendants' liability to all (or nearly all) Class Members.

a)      Whether Defendants made the representations set forth above and substantially similar representations to Plaintiff and members of the proposed classes;

b)      Whether Defendants' advertisements were false, misleading or unfair;

c)      Whether Defendants owed duties to Plaintiffs and the proposed classes, the scope of those duties and if they breached those duties;

d)      Whether Defendants fraudulently induced Plaintiff and the proposed classes into using their website under false pretenses, through material misrepresentations or material omissions;

e)      Whether consumers were harmed by Defendants' actions as described above;

f)      Whether the Terms of Use are unconscionable, illusory, fraudulent or otherwise invalid;

g)      Whether Defendants' employees used non-public data and/or information to gain an advantage at DFS sites, whether Defendants acted in concert to condone, allow or promote this practice, or whether Defendants were negligent in allowing employees to access and use confidential data, or were negligent or committed fraud in failing to disclose to Plaintiff and the proposed classes that these practices were occurring.

42.     Damages can also be determined on a common, formulaic basis.

1277484.1

**D.      Plaintiff's Claims are Typical of the Claims of all Class Members.**

43.      Mr. Belton, like all Class Members, paid money for a competition that was advertised as being one of skill.  Mr. Belton, like all Class Members, paid DraftKings at least one entry fee to pay for a game that he reasonably expected he could use his knowledge and skill of professional sports to have a fair chance of winning.

**E.      Plaintiff and his Counsel Will Adequately Represent the Proposed Class.**

44.      Mr. Belton will put the interests of the Class Members on equal footing with his own interests, and he brings this lawsuit out of a desire to help all Class Members, not merely out of a desire to recover his own damages.

45.      Plaintiff's counsel are highly experienced class action litigators who are well-prepared to represent the interests of the Class Members.

**F.      A Class Action is Superior to Individual Actions.**

46.      Defendants are sophisticated parties with substantial resources.

47.      Each individual Proposed Class Member's damages are relatively small.

48.      Prosecution of this litigation is likely to be expensive.  For example, Plaintiffs' counsel anticipate that to fully analyze damages, expert analysis alone will cost at least tens of thousands of dollars.

49.      Given the high cost of litigation, relatively low individual damages, and the fact that an individual litigating against Defendants would have to hire an expert to perform an analysis regarding damages that would be similar to the analysis required to prove the claims of an entire Class, it would not make economic sense for any (or almost any) Class Member to pursue this litigation as an individual action.

V.    **CLAIMS FOR RELIEF**

**COUNT I—NEGLIGENCE
AGAINST DRAFTKINGS**

50.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

51.    DraftKings owed duties to Plaintiff and members of the proposed class, as users and paying customers of its site, to use reasonable care to provide true, reliable and safe information and contests.

52.    DraftKings breached its duties to Plaintiff and the proposed class by failing to prevent persons with inside information and data by virtue of their employment at other DFS sites from competing against Plaintiff and the proposed classes.

53.    In the course of their business, profession and employment, DraftKings and its agents, representatives, and employees supplied false information to Plaintiff and the proposed class.

54.    Plaintiff and the proposed class justifiably relied upon the information supplied by DraftKings, and, as a result, engaged in business with DraftKings and lost money.

55.    DraftKings failed to use reasonable care in communicating the information about safety and security of data, employee access to data and ability of employees to use material, non-public data to compete against Plaintiff and the proposed classes on other websites, or allow employees of other companies with material, non-public access to compete on the website where Plaintiff and the proposed classes competed.

56.    Plaintiff and other members of the proposed class were damaged in an amount to be proven at trial as a direct and proximate result of DraftKings' negligence.

## COUNT II—FRAUD AND MISREPRESENTATION
## AGAINST DRAFTKINGS

57.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

58.     DraftKings made material representations that were false, that DraftKings knew were false or were reckless as to the veracity and made with the inducement for Plaintiff and the class to act upon.

59.     Specifically, and as detailed above, DraftKings represented that its contests were fair games of skill.  DraftKings also willfully failed to disclose that employees, agents, owners and/or others with non-public information, data and access to Plaintiff and the proposed classes' submissions would use this information to compete against Plaintiff and obtain an enormous increased chance to win, thereby greatly decreasing Plaintiff and the classes' ability to use skill to win.

60.     Plaintiff and the proposed classes acted in reliance on the false, material representations and omissions made by DraftKings, which caused them injury.

61.     Plaintiff and the proposed classes would not have deposited money or engaged in any activity on DraftKings' website if they had known that they were competing against individuals with insider knowledge, access and use of non-public data.

62.     DraftKings was aware that the integrity of the games was a material fact in inducing Plaintiff and the proposed classes to give money in exchange for services and agreeing to the alleged contract.

63.     As a result of DraftKings' fraudulent representations and fraudulent omissions, Plaintiff and the proposed classes were induced into contracts that they otherwise would not have made and suffered financial injury, harm and damages as described in this Complaint.

## COUNT III—CIVIL CONSPIRACY
## AGAINST FANDUEL

64.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

65.     As detailed above, the Defendants engaged in a corrupt or unlawful combination and/or agreement with each other to do an unlawful act, and continued to act in concert after the act was discovered.

66.     Specifically, by affirmatively agreeing to allow competitor's employees to play on their own site against their own players and concealing and not disclosing this to Plaintiff and the proposed classes, Defendants committed negligence and/or fraud.

67.     This overt act was done pursuant to or in furtherance of the conspiracy to allow their employees and officers to profit, continue to attract new players to their websites and otherwise profit because of their unlawful activities.

68.     Defendants gave each other assistance and encouragement in accomplishing the tortious result of having their employees compete against and beat players on other DFS sites.

69.     As a direct and proximate result of Defendants' concerted actions, Defendant FanDuel is also liable to Plaintiff and the members of the proposed class.

70.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

71.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

## COUNT IV—BREACH OF CONTRACT
## AGAINST DRAFTKINGS

72.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

73.     DraftKings entered into contracts with its customers.  The terms of the contract were that in exchange for money, DraftKings promised to provide a fair game of fantasy sports. It included an implied covenant of good faith.

74.     DraftKings breached the contract, including the implied covenant, because DraftKings is not a game of skill, but a game where some players have access to and use inside information, in particular FanDuel employees.

75.      DraftKings also breached the implied covenant of good faith because the contracted vested DraftKings with discretion and control over how the games were carried out; and DraftKings exercised its discretion and control to ensure the games could be exploited by FanDuel insiders to the detriment of Plaintiff and the class.

## COUNT V—TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## AGAINST FANDUEL

76.      Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

77.     An economic relationship existed between Plaintiff and the Class, on the one hand, and DraftKings, on the other.

78.     Defendant FanDuel tortuously interfered with the plaintiffs contract and business relationship with DraftKings because it knew that plaintiff as a customer of expected to play a fair game based on a combination of skill and luck, and not based on superior inside information about selection patterns within the fantasy sports industry.

79.     FanDuel knowingly allowed its employees to exploit their inside information of DraftKings, and knew that Plaintiff and the Class would thus be deprived of a fair game and the chance of winning cash prizes.  FanDuel permitted this conduct to occur because had it prohibited the conduct it would have had to pay its employees more.

80.     FanDuel acted with the knowledge that interference or disruption of Plaintiff's relationship with DraftKings was certain or substantially certain to result from its unlawful conduct.

## COUNT VI—AIDING AND ABETTING
## AGAINST FANDUEL

81.      Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

82.     FanDuel knowingly provided substantial assistance to the torts committed by DraftKings described above.

83.     DraftKings and FanDuel knew that FanDuel employees were using inside information to win money on DraftKings.  Each company stayed allowed this activity to continue in order to keep growing the fantasy sports industry and retain their employees.

84.     As a result, Plaintiff suffered damages.

## COUNT VII—UNJUST ENRICHMENT
## AGAINST DRAFTKINGS

85.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

86.     Plaintiff and the members of the proposed classes conferred a benefit on DraftKings by depositing money and playing in contests on their websites.

87.     By means of their unlawful conduct set forth in this Complaint, DraftKings knowingly acted in an unfair, unconscionable, and oppressive manner towards Plaintiffs.

88.     Through its unlawful conduct, DraftKings knowingly received and retained wrongful benefits and funds from Plaintiffs.  DraftKings therefore acted with conscious disregard for Plaintiffs' rights.

1277484.1

89.     DraftKings has been unjustly enriched in retaining the revenues derived from Plaintiff and the members of the Class, including deposits and contest entries, which retention under these circumstances is unjust and inequitable because DraftKings misrepresented the facts concerning the fair play available on its website.

90.     Plaintiff and members of the Class were injured as a direct and proximate result of Defendants' misrepresentations and omissions because they paid for entry into contests and deposited money onto DraftKings' website, which they would not have done had they known the true facts. Because DraftKings' retention of the non-gratuitous benefit conferred on them by Plaintiff and the members of the Class is unjust and inequitable, DraftKings must pay restitution to Plaintiff and the members of Class for their unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the proposed class pray for relief and judgment against Defendants, as follows:

a.   For an order certifying the Class, appointing Plaintiff and his counsel to represent the Class and notice to the Class to be paid by Defendant;

b.   For damages suffered by Plaintiff and the Class;

c.   For restitution to Plaintiff and the Class of all monies wrongfully obtained by Defendants;

d.   For injunctive relief requiring Defendants to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e.   An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

f.   For Plaintiff's reasonable attorneys' fees, as permitted by law;

g.   For Plaintiff's costs incurred;

h.   For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

i.   For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

1277484.1

## **JURY DEMAND**

Plaintiff demands a trial by jury on all counts so triable.


Dated: October 19, 2015                    Respectfully submitted,


By: _____
    Michael W. Sobol (BBO #555519)

Michael W. Sobol
Brendan P. Glackin (*pro hac vice* to be sought)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
415.956.1000

Jason L. Lichtman (*pro hac vice* to be sought)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York  10013-1413
212.355.9500

*Attorneys for Plaintiff Alem Belton*

1277484.1